Thank you, Judge Kuczynski, and may it please the Court, my name is Mark Caldwell. I'm representing Mr. Amaro this morning in this Social Security Disability Appeal. I will keep track of my own time, but I would like to try to reserve two minutes for rebuttal. There are two bases upon which this Court may exercise its discretion to remand Mr. Amaro's case, preferably for determination of benefits rather than for further administrative proceedings. The first, of course, is the opinion of Dr. Chaya, the treating rheumatologist, and her very important report is found at ER 325, which I would urge the Court to attend to. The second basis, of course, is Mr. Amaro's symptom testimony, that he was simply so wiped out from the effects not only of the severe medications that he was taking but of the rheumatoid arthritis itself that he laid down about six hours out of a typical eight-hour day, and that, of course, coupled with the vocational expert's testimony that those limitations would be inconsistent with sustained work, would require an administrative law judge to enter a finding of disability. Now, against that, the administrative law judge looked at the report of a one-time examining physician, and the examining physician was only two months after Mr. Amaro applied for benefits, obviously did not look at the vast number of records, but most significantly, in my opinion, did not look at the x-ray that was performed as a result of the consultative examination, and that's another important citation to the record that I would like to give at ER 298. And that x-ray report showed severe arthritic changes, fusion of the wrist joints and of the intercarpal joints, which we would call them knuckles. And so this man had basically immobile hands, and that's the most important part of this case. And that's what Mr. Amaro testified to was his greatest problem. So the doctor upon whom the ALJ relied for a one-time examination two months after the application never even mentions these severe findings. And I can only express my amazement that his report says wrists normal. How can the wrists possibly be normal for a man who has fused radiocarpal bones? Radiocarpal bones are the fancy terms of the wrist. You know, I'm looking at 298. What is it that I'm looking for? In 298, that is the x-ray that shows the severe findings. All right. I just want to make sure I'm on the right page. ER 298. There are two numbers. There's 298 in the corner, and I guess there's ER at the bottom. You know, it's a shame. It's kind of wiped out by the address at the bottom. Okay. Let me just make sure I'm on the right page, because I want to make sure I'm on the right page. You go to the bottom right page is the transcript record, which is 353. That might be easier. It's the record from the Arcadia Radiology? Yes. Okay. That's how I was looking at the other. You can't tell the players on the scorecard. Well, that's why I put the – I try to put the excerpt record in a big bar at the bottom to distinguish them from the – Yeah, but they got on top of the writing. Yeah, they did. Anyway, but that's fine. I just want to make sure we're on the same page, literally. Literally. And, of course, as you can see there, advanced arthritic changes with areas of ankylosis. Ankylosis is fusion involving the radiocarpal – that's the wrist – and the intercarpal joints. Those are the knuckles. And it is symmetrical on both sides, so this affected both of his hands. He happened to be left-handed. Yet, the doctor who saw this man one time on ER 293 makes one statement. Wrist joints, colon, within normal limits, period. Yet, he did not even mention the x-ray that was taken as part of this report. I thought this x-ray was taken later in the day, the day that he met with Dr. Young. It may or may not have, but I don't think that's the relevant part. The point is, is that – Well, your x-ray wasn't available for Young. It would have been available by the time he'd written his report if he had taken a look at it. I don't think the fact that it was taken later in the day is an excuse not to look at the report of the x-ray, if it's ordered as part of the consultative examination. The point is, it's not even mentioned in his statement. Precisely. Not even mentioned. But he observed them physically. I mean, you know, he can see how the joints move. But that's the point I'm trying to make. It's just incongruous to say risks are within normal limits when the x-ray that's taken of the risks show that the risks are fused. Those two statements are simply impossible to reconcile. I don't know what the doctor meant when he said within normal limits. Maybe he meant that they weren't swelling. Maybe he meant that they weren't red. I don't know. But he sure as heck couldn't have meant that there was full range of motion, because those risks are fused. X-rays don't lie. So I would submit that that was improper evidence for the ALJ to rely upon. And then, of course, we have the non-examining state agency doctors as well, for whom the ALJ gave significant weight, and they never even laid eyes on Mr. Amaro. So basically I think we have a misrepresentation of the evidence. What is important here to emphasize also is the differing legal standards that this Court is very aware of between treating, examining, and non-examining physicians. So even if the opinion of an examining physician is substantial evidence, that doesn't overcome the deference that is applied to the treating physician's opinion. And that's the Oren case at 495F3-625. So moving to Mr. Amaro. Breyer. One of the reasons that the ALJ gave for discrediting or not giving much weight to, I guess it was Dr. Chaya. Waxman. Chaya was the treating.  Chaya was the treating physician. was that her opinion, that opinion that she gave at the end just before she moved on, was inconsistent with her own notes and didn't reflect the conservative treatment. Conservative treatment. There was no conservative treatment. So would you address kind of what his treatment was? It's reflected in the record. Sure. The man was on Remicade. Remicade has deathly side effects. You have to have clearances, and it's shown in the file. You have to have chest x-rays. You have to have blood work. You have to have shown that you have no fungal infections. I know I'm going into my rebuttal, but I still want to answer your question. He's on Methotrex. Methotrex can kill you. These are not conservative measures by any stretch of the imagination. And since you asked the question, I came up with a case that I just found last night, Scrogham, S-C-R-S-C-O-G-H-A-M, versus Colvin at 7th Circuit, 765F3-685, 7th Circuit, 2014. It says exactly that, that a person who is willing to subject themselves to dangerous medical interventions is credible, not the other way around. I've been on Methotrexate for years. And I've been on Humira, and I know exactly what you're talking about. I have to have blood work every month to show that it isn't killing my liver. That doesn't mean it's not dangerous. It is dangerous, whether we're both on them or not. I've got one minute left, if I may reserve it. Okay. Thank you. Over to the Commissioner. May it please the Court. My name is James Burgess. I'm appearing this morning on behalf of the Acting Commissioner of Social Security. Mr. Amaro claimed that he experienced debilitating pain, not just in his hands, but throughout his body. That's why the ALJ talked about these clinical findings that he found called not only Mr. Amaro's credibility into question, but also Dr. Chaya's opinion. Chief among those was Dr. Young's consultative examination. Dr. Young himself appeared surprised that Mr. Amaro was as functional as he was. He said he was surprisingly coordinated and surprisingly functional. He was able to take his shoes on and off, get on and off the examination table without assistance, and had normal wrists. And that, I think, is something that was raised by Mr. Caldwell that I do want to address, because that does appear to be inconsistent with the X-rays taken that same day. But I think you have to look more closely. And the record, the medical record. Dr. Chaya's records reflect that they were fused. Dr. Chaya's record did reflect fused wrists. That's correct. However, the X-rays themselves noted areas of oncolosis. The X-rays did not say that the wrists were totally fused. There were areas of fusion within those joints. And what matters is what the functional limitations that are caused by those areas of fusion. And Dr. Young simply did not observe any. He opined that Mr. Amaro had no manipulative limitations, that he could, in fact, do the full range of light work. Other objective findings. Did he comment on how long? Pardon me? Did he comment on how long? I mean, the job that was proposed was what, housekeeper? That would involve using those wrists not just occasionally, not just during examination, but hour after hour. Was there any discussion as to, by Dr. Young, as to how long the subject would be able to use his wrists and be active? Dr. Chaya simply included no limitations at all. Which doctor are you talking about? Oh, sorry. Pardon me. Dr. Young. Sorry. He said no limitations. So on what did he base that observation? Simply by watching him in the examining room for 15 minutes? And he also reviewed the records from Dr. Chaya's office and the prior MRIs, which showed the mild erosive changes and mild synovitis in Mr. Amaro's wrists. So those are the records he reviewed, and his examination was what he based his opinion on. Well, we know from the x-ray, which apparently he didn't examine, that there are physical problems with his wrists. And I'm querying, okay, he didn't see that, or on what does he say that, okay, this is somebody who can hour after hour use his wrists. I'm a little skeptical about that. And let me add the other part that I'm skeptical about. As I look at the ALJ's decision, I find it remarkably devoid of specifics when he says that a given opinion is inconsistent, when he says the claimant's testimony is inconsistent. Inconsistent with what? He doesn't give us chapter and verse. He just kind of leaves it to us to go hunting through the records to see if we can find any inconsistencies. And I'm not sure that's sufficient. Well, the ALJ did explicitly talk about the objective studies and those findings. And then when talking about the claimant's testimony. For mental, I know he did, but what's he referring to with regard to the arthritis? The Court should not look at this decision piecemeal. Well, I'm trying not to, but he gives a conclusion referring to Dr. Chaya. I give this opinion limited weight because it heavily relies on the claimant's subjective complaints and is inconsistent with the objective findings, other opinion evidence, and the record as a whole, including Dr. Chaya's own treatment records. But he doesn't tell me what objective findings, and he doesn't tell me what in Dr. Chaya's own treatment records it's inconsistent with. So how am I supposed to know? Well, immediately prior to this, the ALJ on pages 20 and 21 of the transcript goes through those objective findings. At the bottom of page 20 of the record, medical evidence indicates physical symptoms were mild, good muscle strength, bulk and tone, normal gait, sits on the examining table, et cetera, and then cites the specific exhibits. A number of those exhibits, I believe the most treatment notes within any one of those is about four or five. And so this is not a situation where the Court is combing through hundreds of pages of medical records trying to say, well, what is the ALJ talking about here? The ALJ cites two exhibits, 2F, 12F, 14F, 18F, 19F, 21F, and 22F. Notably, in our briefing, we discussed Dr. Kalia's, the later treating rheumatologist's, findings of mild active disease. Dr. Kalia's treatment notes are the only records that are within exhibit 19F of the administrative record. And so I think the Court can say the ALJ explicitly considered these things. Would it have perhaps been easier to determine what he was talking about if he had said 19F page X, Y, or Z? Possibly. But the Court, as it found in a number of cases, it does not leave its ability to read into this decision at the door. If there is a reasonable inference to be found here, the Court may make it. And I think the reasonable inference is the ALJ considered these specific clinical findings. One of the other things the ALJ said, I guess it was in discrediting Amaro's testimony at the hearing, was that he only needed a conservative treatment. But when you look at the drugs that he had to take in order to maintain his condition, I don't think you can say that it's conservative. What were the other options that would be more rigorous? I mean, he's taking Remicade. He had severe problems with Remicade. And a reasonable reading of that, because the ALJ... And then methotroxin. I'm not familiar personally with these drugs. Methotroxin, but they appear to be quite, you know, could have potential serious side effects. Absolutely. And I think it's... And rituxan was another one they wanted to get him on, but I couldn't quite figure out if he ever was taking rituxan. And reading through this, I believe a reasonable reading of that is talking about also the pain medications, as we raise in our brief. Mr. Amaro rarely, if ever, took prescription pain medications. I think that's an important distinction here, because the treatment to treat his rheumatoid arthritis, he went off of certain kinds of the treatment, off the Remicade for a while. But he still was not... There's no evidence that he was on high-strength narcotic or opioid pain relievers, despite his complaints of increasing symptoms. And I believe that is a fair reading of the ALJ's discussion of the conservative routine care. And when you look at the first sentence of that paragraph... I thought Collier prescribed him Percocet. There is, but there's no evidence that he took it. That's the thing. When you look at the later records where he lists his medications that he's actually taking, he never lists a prescription pain reliever. It looks like Dr. Collier did, in fact, prescribe it for him, but there's no evidence that he actually filled that prescription or took it. And on a brief note on the x-rays with Dr. Young, the agency did ask that those x-rays were sent to Dr. Young. The page immediately preceding the x-rays in the record, page 297, asks that those results be faxed to Dr. Young, but for whatever reason, it appears that the radiological facility did not do so, or for whatever reason, Dr. Young did not have access to those. But, again, as I mentioned earlier, what matters not necessarily is what's shown in those x-rays, in those MRIs, but what are the functional limitations that are seen in person. And Dr. Young is the only person in this record, the only physician in this record, who actually tested Mr. Amaro's functional abilities to do things. He did see Dr. Chaya for a long time, and it seems reasonable to think that Chaya, during the course of all her examinations, would have also had an opportunity to observe him. Well, certainly, she had the opportunity to observe him, and she noted her observations of him. But at her examination, her most recent examination prior to the date that she issued her opinion, she saw him in September 2009 for the last time, wrote her opinion in January 2010, after a four-month hiatus. The examination notes, she reviewed the mild MRI findings. Mr. Amaro reported moderate swelling and pain, and she herself reported moderate effects of the rheumatoid arthritis. And yet, four months later, in her opinion, she wrote, severe deforming erosive rheumatoid arthritis. There is just this disconnect between what she recorded in her treatment notes and then what that opinion, four months later, said. Turning to the effectiveness of treatment, another thing to note here is that Dr. Chaya herself apparently believed that the treatment was effective or would shortly be effective. In her opinion, she recommended that he not work for 12 months to give us time to get his symptoms under control, indicating her belief, at least, that he could return to work after those 12 months. Unless the Court has any further questions, I would ask you. Thank you. Thank you. Perhaps the Court might be a little liberal and give me a couple extra seconds on rebuttal, but we'll see. The MRI that the Commissioner thinks is so important is a 251. It was before the onset date of disability. It's irrelevant. The problem the Commissioner is focusing on, lack of swelling, that's not the problem. The problem is contractures of the hands because they're frozen. And a good example of that is at 332. The ALJ referred, as the Commissioner's counsel noted, to normal range of motion. It's simply not true. Go through Dr. Chaya's records and you will continually see an abbreviation, DROM, stands for decreased range of motion. You can't rewrite the evidence in an ALJ decision in order to support it. And I guess I'm going to stay within my one minute, unless the Court has further questions for me. If you have any, thank you. The case will stand submitted. We're adjourned.
judges: Kozinski, Paez, Clifton